UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

|  |  |  |
|---|---|---|
| Spencer Bagwell, | ) | C/A:  8:06-CV-02272-GRA |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | **Order** |
|  | ) | (Written Opinion) |
| Fafard, Inc., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

This matter comes before the Court on Defendant Fafard, Inc.'s Motion for Summary Judgment pursuant to Rule 56, Federal Rules of Civil Procedure. For the reasons set forth below, the Motion is granted.

### I.  PROCEDURAL HISTORY

This is an employment discharge case in which Plaintiff Spencer Bagwell (hereinafter "Mr. Bagwell") alleged that the termination of his employment by Fafard, Inc. (hereinafter "Fafard"), for violation of its non-harassment policy, was a breach of an implied employment contract embodied in certain of Fafard's written workplace policies. Mr. Bagwell brought this action in the South Carolina Court of Common Pleas in Anderson County on July 12, 2006. Thereafter, it was removed to this Court on diversity grounds by Fafard, which then served an Answer denying Mr. Bagwell's claim. At the close of discovery, Fafard moved for summary judgment on the alternative grounds that there was no implied contract of employment between it and

Mr. Bagwell and that it had not breached any such alleged contract. The parties have submitted memoranda and supporting excerpts from the record, and presented argument to the Court on Monday, June 25, 2007.

## II.  STATEMENT OF THE FACTS

The factual background set forth herein is stated in the light most favorable to Mr. Bagwell. Fafard operates a soil and fertilizer production facility in Anderson, South Carolina, at which Mr. Bagwell was employed from June 1999 through September 2003. Mr. Bagwell was hired as a machine operator, but at the time of his termination, had been promoted to a salaried Team Leader position in which he was responsible for monitoring the production process and ensuring that other employees properly performed their work.

The sequence of events that led to Mr. Bagwell's termination began in July or August 2003. While in the Shipping Department during a break, Mr. Bagwell claims that he was conversing with several other employees – Wesley Brooks, Jeff Bannister, David Crocker, Curtis Coker, and John Willoughby. Mr. Bagwell testified that Mr. Bannister made comments to the effect that one of the truck drivers who contracted with Fafard was receiving more favorable work assignments because he was having an affair with Lynn Fleming, a Fafard employee who handled scheduling of the truck routes. According to Mr. Bagwell, Mr. Bannister went on to say that the person with whom Ms. Fleming was allegedly having an affair had claimed that Ms. Fleming "had the hairiest red bush ever seen by man's eye."

On September 24, 2003, Mr. Bagwell was riding back to the facility from lunch with Mr. Brooks and female employees Pam McCracken and Chris Childs. According to Mr. Bagwell, Ms. McCracken asked him if he had heard any further mention of the rumor to the effect that "Ms. Fleming was having an affair with Mr. Cooper." Mr. Bagwell testified that he responded that he had not heard that rumor discussed "anymore."

Apparently, concerned about the effect that the rumor would have if it continued to spread,[1] Ms. McCracken approached Ms. Fleming later that day and told her about the rumor regarding the alleged affair. Ms. Fleming testified that she was told by Ms. McCracken that Mr. Bagwell was spreading the rumor about the affair. Accordingly, Ms. Fleming confronted Mr. Bagwell when she saw him later that day.

Mr. Bagwell testified that Ms. Fleming was already "highly upset" when she asked to speak with him. According to Mr. Bagwell, Ms. Fleming informed him that she had been told by Ms. McCracken that Mr. Bagwell knew about the rumor, and Ms. Fleming proceeded to ask him what he knew of it. Mr. Bagwell first said that he did not know what she was talking about, to which Ms. Fleming responded "Yes, you do." Mr. Bagwell proceeded to repeat the rumor he claims to have heard from Mr. Bannister about the supposed affair between Ms. Fleming and the truck driver. Mr. Bagwell then told Ms. Fleming the following: "he made the statement that you had the hairiest red bush seen by man's eyes." A stunned Ms. Fleming responded "Excuse me? What did

---

[1] Ms. Fleming's son was a Fafard employee, supervised by Mr. Bagwell, who had been out on medical leave and was due to return to work several days after September 24, 2003.

3

you say?" Mr. Bagwell then repeated the vulgar reference to Ms. Fleming's pubic hair. Ms. Fleming immediately indicated her intention to take the matter up with Human Resources Administration Manager David Crabb. Mr. Bagwell agreed that "[t]hat's what I would do too."

Ms. Fleming testified that she was shocked and upset by Mr. Bagwell's comments, and was physically shaking even after arriving at her home later that evening. Early the next morning, Ms. Fleming approached Operations Manager Marc Powell and told him that she needed to talk immediately. This initiated an investigation into the incident between Ms. Fleming and Mr. Bagwell. Mr. Bagwell was initially suspended for three days as the Company reviewed the results of witness interviews.

During the course of the investigation, Mr. Crabb and Plant Superintendent David Shiverdecker interviewed several witnesses, including Mr. Bagwell, Ms. Fleming, Ms. McCracken, Mr. Brooks, Mr. Coker, Mr. Bannister, Mr. Willoughby, Mr. Crocker, and Ms. Childs. The interviews were summarized in notes taken by Mr. Shiverdecker and utilized by the management team that ultimately decided to terminate Mr. Bagwell. The interview notes compiled by Shiverdecker and relied upon by Fafard reflected substantial conflict as to the source of the rumor about the alleged affair. However, there was no such conflict with respect to the comment about Ms. Fleming's pubic hair: other than Mr. Bagwell, the witnesses interviewed either had not heard the comment prior to the incident on September 24th or had heard it from Mr. Bagwell.

Upon completing the investigation and discussing the potential disciplinary options, Fafard reached several conclusions.  First, Mr. Bagwell was the only employee who made a vulgar reference to a female employee's pubic hair in a face-to-face conversation with her.  Whatever inappropriate comments or rumors may have been passed around among the men in the Shipping Department, Mr. Bagwell was the only employee who put the company at risk by making a highly offensive personal remark directly to a female employee.  Second, Mr. Bagwell's comment was in violation of the company's non-harassment policy, and came less than a month after Mr. Bagwell had received training on such policy.  Third, based on the statements of the witnesses interviewed by the company, the company concluded that Mr. Bagwell himself was the source of the offensive comment.  Fourth, despite his status as a salaried Team Leader, Mr. Bagwell had participated in spreading vulgar comments about a co-worker and had failed to take any action to report such misconduct or reprimand the employees who allegedly made the improper remarks.

Under the circumstances, the company concluded that Mr. Bagwell had committed an egregious violation of the Non-Harassment Policy and should be terminated.  Company officials met with Mr. Bagwell on the Tuesday following his initial three-day suspension and advised him that his employment was terminated.

### III.  DISCUSSION

**A.    Standard of Review**

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court should grant

summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When a defendant properly offers its motion for summary judgment with evidence that supports the view that the defendant is entitled to judgment as a matter of law, the plaintiff must present "affirmative evidence" to establish a genuine dispute of material fact in order to defeat the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). If the plaintiff fails to do so, the Court must grant summary judgment against the plaintiff. *Id*. In order to establish that a genuine issue of material fact exists, the plaintiff must show that there is evidence upon which a finder of fact can reasonably find in his/her favor. *Id.* at 252. Conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

**B.    Mr. Bagwell Cannot Establish the Existence of a Contract of Employment Altering the Normal Presumption of At-Will Employment Status.**

Under South Carolina law, "termination of an at-will employee normally does not give rise to a cause of action for breach of contract." *Conner v. City of Forest Acres*, 560 S.E.2d 606, 610 (S.C. 2002); *Williams v. Riedman*, 529 S.E.2d 28, 32 (S.C. Ct. App. 2000). However, when an employer issues a handbook or policy manual stating in mandatory or promissory language that certain limits will be placed on the employer's right to terminate an employee, such language may give rise to an implied

6

contract altering the normal at-will employment relationship. *See Horton v. Darby Elec. Co.*, 599 S.E.2d 456 (S.C. 2004); *Small v. Springs Indus., Inc.*, 357 S.E.2d 452 (1987). Employment contracts are construed by South Carolina courts in the same manner as any other contracts, including the admonitions that "in determining the intent and purport of a contract, the court should not look solely to one clause read in isolation from the rest of the document; rather, it should consider the contents of the whole instrument" and that "[w]here one construction makes [a] provision unusual or extraordinary and another construction which is equally consistent with the language employed would make it reasonable, fair, and just, the latter construction must prevail." *Holden v. Alice Mfg., Inc.*, 452 S.E.2d 628, 631 (S.C. App. 1994) (affirming summary judgment for employer where employee's construction of handbook was not consistent with the above standards).

South Carolina courts will not allow an implied contract claim to go to a jury simply because a handbook contains a progressive discipline scheme or some other language pertaining to termination of employees—such provisions must be stated in mandatory or promissory terms to create an issue of fact as to whether an implied contract exists. *Horton v. Darby Elec. Co.*, 599 S.E.2d 456 (S.C. 2004); *Conner v. City of Forest Acres*, 560 S.E.2d 606 (S.C. 2002). 1*See also, Prescott v. Farmers Tel. Co-Op.*, 491 S.E.2d 698, 702 (Ct. App. 1997), *rev'd on other grounds*, 516 S.E.2d 923 (1999) (holding that provision of a policy manual that was "not a mandatory process before termination can occur" was insufficient to modify the

employment at will doctrine); *Storms v. Goodyear Tire & Rubber Co.*, 775 F. Supp. 862, 867 (D.S.C. 1991) ("Non-mandatory and permissive language is evidence that the employer did not intend to create a binding agreement."). In *Hessenthaler v. Tri-County Sister Help, Inc.*, 616 S.E.2d 694 (S.C. 2005), the South Carolina Supreme Court held that the issue of whether a handbook constituted a contract should not have been submitted to a jury where the nondiscrimination policy in the handbook at issue did not make any promises regarding disciplinary procedures or termination decisions. The Court pointed out that mandatory progressive discipline procedures "typically provide that an employee may be fired only after certain steps are taken. When definite and mandatory, these procedures impose a limitation on the employer's right to terminate an employee at any time, for any reason." 616 S.E.2d at 698. Progressive discipline that is merely permissive has no such effect. *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 20 (S.C. Ct. App. 2006). To qualify as mandatory language sufficient to establish an implied contract, policy manual language "must be definitive in nature, promising specific treatment in specific situations." *Hessenthaler*, 616 S.E.2d 694, 698.

In cases involving allegations that an employment contract arising out of a handbook or policy manual was breached, the relevant inquiry is not whether sufficient cause existed for termination under any applicable policies; the question is whether the employer had a reasonable good faith belief that termination was warranted under any such policies. *Horton v. Darby Elec. Co.*, 599 S.E.2d 456, 461 (S.C. 2004).

8

In this case, Mr. Bagwell's Complaint set forth three Fafard policies that he contends establish a contract altering the employment-at-will presumption. Mr. Bagwell confirmed at deposition that he does not rely on any other written policies in support of his contract claims.

### 1. A policy providing that "[e]mployees shall be disciplined or discharged only for just cause . . ." does not create a contract.

The Complaint alleges that a contract was created by virtue of a Disciplinary Policy dated March 31, 2003, that provides that "[e]mployees shall be disciplined or discharged only for just cause . . ." Asked about this policy at deposition, Mr. Bagwell insisted that it was never distributed to him while he was at Fafard and that he never laid eyes on it during his employment. He admitted that he only obtained the policy after his termination. Mr. Bagwell then testified that he may have been subject to an earlier policy which may have mentioned "just cause" as well. However, Mr. Bagwell could not recall with any specificity the nature of the reference to "just cause" in the prior document he was allegedly given or the definition or context of the term.

Regardless of which policy applied to Mr. Bagwell, mere reference to "just cause" as a limitation on discipline is not sufficiently definite to establish an employment contract altering employment-at-will under South Carolina law. *See Davis v. Orangeburg-Calhoun Law Enforcement Comm'n*, 542 S.E.2d 755, 760 (S.C. Ct. App. 2001) (supervisor's statement that an employee would "only be terminated for cause" not sufficiently definite to establish contract of employment); *Grant v. Mount*

9

*Vernon Mills, Inc.*, 634 S.E.2d 15, 21 (S.C. Ct. App. 2006) (policy language providing that the employer would be "fair and just" was too indefinite to create a contract of employment). Such language is not "definitive in nature, promising specific treatment in specific situations." *Hessenthaler*, 616 S.E.2d 694, 698. [2]

### 2. The Non-Harassment Policy does not create a contract of employment.

Mr. Bagwell's Complaint alleges that the following language in the Non-Harassment Policy establishes an implied contract:

> No disciplinary action will be taken without thorough investigation of the facts which shall include gathering statements from all parties and witnesses involved in the matter.

Mr. Bagwell admitted that the very next sentence provides that "[e]mployees not satisfied with the results of the investigation can contact the Equal Employment Opportunity Commission located in your local telephone directory." Mr. Bagwell also admitted that he understood the paragraph listed in the Complaint simply to provide that an investigation was to be performed prior to disciplinary action being taken and that the remedy in the event the employee was not satisfied with such an investigation was not contractual but was whatever recourse might be available through the Equal Employment Opportunity Commission. This is not a promise altering employment-at-will because it does not limit, as a matter of contract, the right of Fafard to terminate Mr. Bagwell's employment.

---

[2]     In the very same paragraph in which the quoted reference to "just cause" appears in the Disciplinary Policy, the following is also included: "[t]his disciplinary policy **is for guidance only**, and steps in the procedure can be omitted at management's discretion." This further demonstrates that the reference to "just cause" does not give rise to any particular contractual rights.

10

**3.  Neither of the sections of Fafard's Plant Rules cited in the Complaint establish a contract of employment.**

The Complaint alleges that Fafard's Plant Rules established an implied contract of employment.  On the first page of the Plant Rules, there is a discussion of the "Progressive Disciplinary Policy," the entirety of which reads as follows:

>POLICY:
>
>The following Fafard Plant Rules are established for your safety as well as the safety of your fellow associates and to help enforce order in the workplace.  Violations are subject to our Progressive Disciplinary Policy.  The Progressive Disciplinary Policy is a guide which may be modified in accordance with the severity of the improper act and will be followed along with independent avenues or channels. There are: [sic]
>
>Depending upon the severity of violations, discipline may be imposed from counseling to immediate discharge.  However, it should be emphasized that after one or more incidents in each of the following areas, it may be decided that an associate's total job performance is unsatisfactory and may be more severely disciplined.

On the last page of the Plant Rules, the following appears:

>**DISCIPLINARY POLICY**
>
>First Infraction—verbal warning
>
>Second Infraction—written warning
>
>Third Infraction—2 week suspension—10 working days
>
>Fourth Infraction—Termination

The language on the first page makes clear to the reader of the Plant Rules that the imposition of discipline is subject to management discretion.  In particular, the

statement on the first page of the Plant Rules that "[d]epending on the severity of violations, discipline may be imposed from counseling to immediate discharge," and that "[t]he Progressive Disciplinary Policy is a guide which may be modified" clearly put employees on notice that no rigid adherence to disciplinary steps was being promised.

This language is well in line with the permissive language that warranted summary judgment in *Horton* and *Grant*.  See *Horton v. Darby Elec. Co.*, 599 S.E.2d 456, 461, n. 8 (S.C. 2004) ("The permissive language is as follows: (1) the disciplinary procedure 'is to be viewed as the guiding policy insofar as taking disciplinary action . . .;' (2) 'supervisors are not required to go through the entire three steps involved in the disciplinary procedure;' [and] (3) 'discipline may begin at any step in the procedure depending on the seriousness of the offense committed . . .'"); *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 22 (S.C. Ct. App. 2006) (statement that "[w]arnings are normally given . . ." deemed permissive rather than mandatory language).  Accordingly, the portions of the Plant Rules excerpted in the Complaint cannot give rise to any contractual rights.

### C.    Mr. Bagwell Cannot Establish That Any Contract of Employment Altering the Normal Presumption of At-Will Employment Status Was Breached By Fafard.

In addition to establishing the existence of some contract altering employment-at-will, Mr. Bagwell must show that the contractual terms applied to him and that the employer violated the contractual terms.  *Jones*, 503 S.E.2d at 177 (citing *Miller v. Schmid Lab., Inc.*, 307 S.C. 140, 414 S.E.2d 126 (1992).  Ultimately, he must show

12

that Fafard did not have a reasonable good faith belief that termination was warranted under the various Company policies giving rise to the alleged contract of employment. *Horton v. Darby Elec. Co.*, 599 S.E.2d 456, 461 (S.C. 2004).

### 1. Fafard did not breach the "just cause" provision of its Disciplinary Policy.

With respect to the "just cause" provision, such a nebulous concept does not give rise to any particular enforceable contractual right, and Mr. Bagwell therefore cannot establish that such standard was breached. Moreover, to the extent it can be said to create a substantive standard for misconduct warranting termination, the "just cause" language is easily satisfied in light of Mr. Bagwell's admitted misconduct: telling a female co-worker—twice—that he had been told her pubic hair was "the hairiest red bush seen by man's eyes." The Company's investigation revealed that despite these offensive remarks having apparently been well known to certain other employees, Mr. Bagwell was the only employee who was sufficiently lacking in basic standards of decorum and common sense to repeat the remarks directly to the female co-worker in question.[3] The Company was well within the realm of reasonable belief in concluding that making such offensive remarks to a female colleague constituted "just cause" for termination.

---

[3] Mr. Bagwell attempts to blunt the force of this finding by pointing out that Company witness David Crabb admitted that Mr. Bagwell's co-worker Jeff Bannister also addressed the remark about Ms. Fleming's pubic hair in a conversation with her. However, that testimony does not reflect that Mr. Bannister repeated the offensive remark, but rather makes clear that Mr. Bannister referred to it only insofar as he was explaining that he would forbid other employees under his supervision from ever discussing the matter again. This was obviously designed to mitigate the harm caused by Mr. Bagwell's offensive remarks and cannot reasonably be regarded as comparable.

Mr. Bagwell claimed that it was unreasonable for the Company to view his remarks as violating the non-harassment policy because they were allegedly made in response to a direct question, and thus were both "solicited" and "welcome." However, the record is clear that Ms. Fleming was asking about the rumor that she was having an affair.  Mr. Bagwell could not reasonably have believed that Ms. Fleming's understandable desire to confront the rumor also signified her interest in hearing demeaning and vulgar comments about her body.  It was reasonable as a matter of law for the Company to conclude that Mr. Bagwell knew or should have known that despite the question he was asked, making graphic comments about Ms. Fleming's pubic hair was not acceptable in the workplace.

  **2. Fafard did not breach its Non-Harassment Policy.**

The Non-Harassment Policy provision indicating that a "thorough investigation" is to be performed prior to the imposition of discipline clearly was met here, given the numerous witnesses who were interviewed and the testimony that the notes of such interviews were considered during the decision-making process.  Mr. Bagwell argues that Fafard fell short of its contractual obligations by (1) not obtaining statements written by the witnesses themselves rather than simply taking notes during oral interviews, (2) failing to interview the alleged source of the rumor that Ms. Fleming was having an affair and (3) failing to investigate whether the rumor that Ms. Fleming was engaging in favorable treatment of her alleged paramour was true.

There is no reason to believe that written statements would have differed in any

material way from the findings set forth in the Company's investigative notes. Mr. Bagwell has not produced a single witness whose account of any of the events differs from what such witness told the Company. Accordingly, any contention that the Company's notes were inaccurate is entirely speculative and thus incompetent as proof. Moreover, the form in which witness statements are recorded does not make an investigation any more or less "thorough."

Regarding the alleged insufficiency of the investigation itself, Mr. Bagwell mischaracterizes the purpose of the investigation. Fafard stated that the reason for Mr. Bagwell's termination was that he made highly offensive, vulgar remarks directly to Ms. Fleming. The ultimate source of the rumors, and whether they were true, was irrelevant to determining whether Mr. Bagwell made the offensive comments. It would not have justified Mr. Bagwell's offensive remarks if it turned out Mr. Bagwell was not the originator of the rumor about the affair or even if the rumor was true. Rather, the bottom line was that Mr. Bagwell had placed the Company at great risk and severely disrupted the professional atmosphere in the workplace by making comments that were plainly in violation of the Company's non-harassment policy.

### 3.  **Fafard did not breach any obligations under the Plant Rules.**

As discussed above, it is plain that the Plant Rules did not promise rigid adherence to any particular steps of progressive discipline. To the extent any promise was made, it was to use the disciplinary steps as a guide, with management discretion to proceed to termination in particularly serious cases. There is little question that this

was such a case.

Mr. Bagwell took what was already a workplace problem – an inappropriate rumor about a co-worker that he did nothing to stop despite his responsibilities as a Team Leader – and exacerbated the problem dramatically by making a deeply offensive vulgar remark directly to the female co-worker affected by the rumor.  He converted an improper but consensual subject of banter in the Shipping Department into a major risk of liability to the company under federal anti-harassment law.  Fafard reasonably regarded this as an extremely serious incident.  That Mr. Bagwell was a Team Leader who had received sexual harassment training just weeks earlier was further proof that his misconduct was reasonably considered worthy of skipping steps in the disciplinary procedure.  Mr. Bagwell has offered no proof that, using its progressive discipline scheme as a "guide" pursuant to the express language of the Plant Rules, Fafard was unreasonable in deciding to proceed directly to termination rather than use a less severe form of discipline.

## IV.  CONCLUSION

For the reasons set forth herein, this Court finds as a matter of law that Mr. Bagwell is unable to establish the existence of a binding employment contract limiting the right of Fafard to terminate his employment.  The Court further finds as a matter of law that to the extent any of the policy language cited by Mr. Bagwell could be deemed to rise to the level of a contract, Fafard's termination of Mr. Bagwell's employment was fully consistent with its obligations under any such contracts.  Accordingly, Fafard's motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure is GRANTED and this case is hereby DISMISSED.[4]

_____
G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

July 11, 2007

Anderson, South Carolina

---

[4]  Mr. Bagwell also asserted a claim for breach of the implied covenant of good faith and fair dealing.  (Compl. ¶ 37.)  This claim is only applicable insofar as a contract is held to exist.  *RoTec Servs. v. Encompass Servs.*, 597 S.E.2d 881, 883-84 (S.C. App. 2004).  As discussed herein, there was no employment contract in this case and thus the implied covenant is not applicable.  Moreover, Fafard did not breach the terms of any alleged employment contracts, and its termination of Mr. Bagwell therefore does not run afoul of the covenant of good faith and fair dealing.